# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52585-2-II |
| Respondent, | |
| v. | |
| LARRY AYO PETERS, JR., | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Larry Ayo Peters Jr. appeals from his jury trial convictions for first degree kidnapping, felony harassment, and second degree assault of his former girlfriend, MT, and the deadly weapon sentencing enhancements related to each conviction. He argues that (1) the State's late disclosure of impeachment evidence amounted to a *Brady*[1] violation that violated his right to a fair trial and (2) the deadly weapon sentencing enhancements violated his right to a unanimous verdict because the jury was not instructed that it had to be unanimous as to which weapon he was armed with when it made the deadly weapon special verdict findings. Because Peters fails to show that the late-disclosed evidence was material and the State elected in closing argument what

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

weapon it was relying on to prove the deadly weapon sentencing enhancements, we affirm the conviction and deadly weapon sentencing enhancements.

FACTS

I. BACKGROUND

On January 12, 2017, at about 12:30 PM, officers from the Fife Police Department responded to a 911 call from MT. MT reported that Peters had lured her to a motel room the night before with a false text message that she thought came from a friend and had attacked her. She told the responding officers that Peters had shocked her with a "stun gun" in the side of her neck and stomach, sexually assaulted her, and threatened to kill her. 5 Verbatim Report of Proceedings (VRP) at 462.

Officers located Peters at the motel. When the officers took Peters into custody, they found and confiscated two cell phones. Peters was transported to the hospital because he was experiencing health issues.

At the hospital, Detective Sergeant Thomas Thompson and Detective Jeff Nolta interviewed Peters. Nolta later downloaded information from the two cell phones and produced reports about their contents, which include text messages to and from MT.

II. PROCEDURE

A. CHARGES

The State charged Peters by amended information with first degree kidnapping, first degree rape, felony harassment, second degree assault, and violation of a domestic violence court order. The State also alleged that Peters committed each of these offenses while armed with a deadly weapon. The case proceeded to a jury trial.

B. TRIAL

Nolta, Thompson, Captain Aaron Gardner, MT, and the sexual assault nurse examiner testified for the State. Peters did not present any evidence.

1. TESTIMONY

a. NOLTA'S TESTIMONY

Nolta testified about his and Thompson's interview with Peters in the hospital. Nolta also testified about his forensic examination of the two cell phones that Peters had been carrying.

b. THOMPSON'S TESTIMONY

Thompson testified about contacting MT at about 12:30 PM following her 911 call on January 12. When he arrived, MT described what had happened; her description was largely the same as her trial testimony. Thompson observed that MT had injuries to her neck and stomach.

After MT was taken to the hospital, Thompson went to the motel, where other officers were taking Peters into custody. Thompson's testimony about what happened at the hospital was the same as Nolta's, but Thompson provided more detail about the interview.

c. GARDNER'S TESTIMONY

Gardner testified that he contacted Peters by phone at the motel and asked him to step out of the room to talk to the officers outside of his room. Peters eventually left the room and was arrested.

d. MT'S TESTIMONY

MT testified that Peters lured her to the motel room by sending her a text purporting to be from another friend and inviting her to the motel on the evening of January 11. When she arrived, she was attacked by a person wearing black clothing and a black mask, whom she later recognized

3

as Peters. Peters shocked her with a stun gun to the side of her neck, and she fell to the floor. Peters then used the stun gun on her stomach.

MT testified that Peters took away her cell phone and then told her that he wanted to have sex with her "one last time" and ordered her to remove her clothing. 1 VRP (Mar. 12, 2018) at 119. Peters threatened to kill her and then himself and swung a machete within inches of her head. MT complied with Peters's demands because she feared for her life and thought Peters would kill her with the machete if she did not comply. After having sex, Peters fell asleep, but MT did not attempt to escape because she feared she would wake him and make him angry. MT eventually managed to escape and contact law enforcement.

### e. FORENSIC NURSE EXAMINER'S TESTIMONY

Tasha Cushman, the forensic nurse examiner who examined MT, testified that MT told her (Cushman) that she (MT) had cooperated with Peters because she was afraid for her life and thought that if she cooperated she might be able to try to escape. MT described being stunned, and Cushman saw stun gun marks on the left side of MT's neck and abdomen. MT also described other weapons, such as a machete, "a big long sword thing," and "zip tied handcuffs." 6 VRP at 594. MT further reported that Peters had threatened to kill her and then himself and to kill her if she reported the incident.

### 2. JURY INSTRUCTIONS

After the parties rested, the trial court instructed the jury on the substantive offenses and the deadly weapon sentencing enhancement special verdict forms. The trial court did not instruct the jury that it had to be unanimous as to which weapon was the basis of any deadly weapon sentencing enhancement special verdict, nor did Peters request such an instruction.

###### 3. CLOSING ARGUMENTS AND VERDICT

During its closing argument, the State discussed the deadly weapon sentencing enhancement special verdicts. The State argued that the deadly weapon sentencing enhancement special verdicts were based solely on Peters having been armed with the machete.[2]

The jury found Peters guilty of first degree kidnapping, harassment, and second degree assault.[3] It also found that Peters was armed with a deadly weapon when he committed each of these offenses.

### C. MOTION TO DISMISS

After the verdict, but before sentencing, Peters moved to dismiss the charges under CrR 8.3(b), based on governmental misconduct. Peters alleged that the State had violated *Brady* by failing to disclose potential impeachment evidence related to Nolta that had existed prior to Nolta's March 12 testimony.

Peters stated that on May 15, well after Nolta testified, the State disclosed a February 20, 2018 disciplinary report concluding that in a different case Nolta had "committed a series of acts which had potential impeachment value to the defendant in this case." Clerk's Papers (CP) at 226. Peters alleged that the report disclosed that Nolta had been "found to have improperly accessed and reviewed jail phone calls made by a defendant [in another case], without a legitimate investigative purpose, in violation of [Fife Police] Department rules." *Id*. Peters further alleged that "Nolta also listened to at least one privileged phone call between a defendant [in another case]

---

[2] We describe and discuss this part of the State's closing argument in more detail in the analysis.

[3] The jury also found Peters guilty of violation of a no-contact order, but the trial court later vacated that conviction and dismissed the charge. The jury acquitted Peters on the first degree rape charge.

and an attorney's office without disclosing that he had done so," that Nolta had "allowed others to use his secure login and, in the past, had listened to privileged attorney client phone calls in other cases." *Id*. Peters asserted that Gardner, who had also testified at trial, signed the disciplinary report and that Thompson was involved in the investigation. The trial court denied the motion to dismiss.

Peters appeals his convictions and the deadly weapon sentencing enhancements.

ANALYSIS

Peters argues that (1) he is entitled to a new trial because the State's failure to disclose Detective Nolta's disciplinary action was a *Brady* violation that deprived him of a fair trial and (2) we should reverse the deadly weapon enhancements because the trial court failed to instruct the jury that its verdict on the special verdicts had to be unanimous as to which weapon Peters was armed with at the time of each offense. These arguments fail.

I. *BRADY* ISSUE

Peters argues that the State's failure to disclose Nolta's disciplinary action was a *Brady* violation and that this violation undermines confidence in the verdict and deprived him of a fair trial.[4] We disagree.

To establish a *Brady* violation, a defendant must demonstrate the existence of each of three elements: "(1) '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'th[e] evidence must have been suppressed by the

_____

[4] Peters does not argue that the trial court erred when it denied his CrR 8.3(b) motion to dismiss for governmental misconduct. He argues that the *Brady* violation undermines only confidence in the verdict and deprived him of a fair trial.

State, either willfully or inadvertently,' and (3) the evidence must be material." *State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

"Evidence is material under *Brady* 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 73 (internal quotation marks omitted) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). A reasonable probability exists if the suppression of the evidence "'undermines confidence in the outcome of the trial.'" *Id.* (internal quotation marks omitted) (quoting *Kyles*, 514 U.S. at 434). Whether the evidence in question is material is a legal issue that we review de novo. *Id.* at 74-75. The undisclosed evidence here was not material because there is no reasonable probability that the result of the proceeding would have been different if this information had been timely disclosed.

As to Nolta's testimony about his contact with Peters and Peters's statements while at the hospital, that testimony was merely cumulative because Detective Sergeant Thompson testified to the same facts. Because this same evidence was presented by a second witness whose credibility was not implicated by the late-disclosed evidence,[5] we hold that the late-disclosed evidence does not undermine confidence in the verdict in this respect.

---

[5] Peters appears to suggest that the late disclosure about the investigation was also a *Brady* violation with respect to Thompson and Captain Gardner because they were involved in the investigation of Nolta. But Peters does not explain how mere involvement in an investigation of another officer provided any exculpatory or impeachment evidence. Accordingly, there is no *Brady* violation in respect to Thompson or Gardner.

As to Nolta's testimony about the cell phone data, defense counsel used that information in closing argument to raise issues about MT's credibility. Because Peters himself used this testimony to support his closing argument, Peters does not show how impeaching the source of that evidence would have changed the result of the proceeding.

Because Nolta's evidence was either cumulative or was helpful to Peters, we hold that Peters does not show materiality. Thus, his *Brady* claim fails.

## II. DEADLY WEAPON SENTENCING ENHANCEMENTS

Peters next argues that we should reverse the deadly weapon sentencing enhancements for each offense because the trial court did not instruct the jury that it had to be unanimous as to which weapon, the stun gun or the machete, was the basis for the enhancements. He contends that this is a multiple acts issue and that the State's attempts to elect were ambiguous.

Article I, section 21 of the Washington State Constitution gives criminal defendants the right to a unanimous jury verdict. *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017). When the State presents evidence of multiple acts that could form the basis of the crime charged, either the State must elect to rely on just one of the acts or the jury must be instructed to reach a unanimous verdict based on the specific act that supports a finding of guilt. *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). Here, even presuming, but not deciding, that the unanimity rule applies to deadly weapon sentencing enhancements, there was no unanimity issue because the State clearly elected the type of weapon used in relation to each of the special verdicts.

When addressing the special verdict for the deadly weapon sentencing enhancement for the first degree kidnapping charge, the State argued,

> That room was not a big room. It was a standard two-queen room in any motel
> we've ever been in, and you can see it. You can see those pictures, and she told

8

you where they were arrayed.  The machete at one point was over by the chair, which was between the two beds.  She told you the other items were all laid out for him on that table or desk thing that was underneath the TV.  They were very much available to him, and that room was not a giant room.  There wasn't a ton of walking space in there, so yeah, they're readily accessible to him for offensive or defensive, if she decided to fight back.  He had pepper spray, he had gel spray, he had plenty of things to utilize, right?

But really the question -- I should clarify.  *The Special Verdict Form is with regard to the machete, so whether the machete was readily accessible*, okay.  Perhaps also the [stun gun], but I think more -- you're on firmer ground, *I would submit and ask you to rely on the machete*, okay.

. . . .

. . . There was a connection between the *machete* and the defendant, and he rented the room, right?  It's his room.  It was in his room.  There's a connection.  And there was a connection between the weapon and the crime.  *Was there a connection between this machete and the kidnapping*?  Yeah.  One of the reasons she was restrained in the room, one of the reasons she didn't flee when that door was opened is because she was afraid she was going to die.  One of the reasons, one of the ways he kept her under his control that night was with this *machete*.  So yes, *there was a connection between the machete and the crime*.

7 VRP at 682-83.

Although the State mentioned other weapons, this argument clearly directed the jury to consider *only* the machete as the basis for the deadly weapon enhancement for the kidnapping charge.

When addressing the special verdict for the deadly weapon sentencing enhancement on the felony harassment charge, the State argued, "Was he armed with a deadly weapon?  Again, this pertains to Instruction 34[6] *regarding the machete*.  Yes, he was physically holding it while he threatened to murder her." *Id.* at 692.  As Peters himself concedes, this was a clear election of

---

[6] Jury instruction 34 instructed the jury on the deadly weapon special verdict and defined the term deadly weapon for this purpose.  The State was distinguishing this definition of deadly from the definition of deadly weapon that applied to the substantive offenses, jury instruction 16.

the machete as the only basis for the deadly weapon enhancement for the felony harassment charge.

When addressing the special verdict for the deadly weapon sentencing enhancement on the second degree assault charge, the State argued,

> And was he armed with a deadly weapon at the time? *Remember, this regarding the machete*, so the question is, so you may -- I don't think you should, but *you may determine that when he [stunned] her at the door, that the [stun gun] was a deadly weapon, but he was not armed with the machete, in which case you could return a guilty on [the verdict form for the crime of second degree assault] and answer [the deadly weapon special verdict for related to the second degree assault charge] as a no*. But remember what Instruction 34 tells us about "armed." Armed means readily available. It doesn't mean in his hand. And what did we have? We had a room where he had staged it and set it up, weaponry laid out, and *the machete* was near enough that he was dragging her to it. *So I would submit to you, yes, you find, yes, he was armed with a deadly weapon, with the machete at the time*.

*Id.* at 696-97.

The State's argument clearly distinguished between what weapon the jury was to consider when considering the offense from the weapon it was to consider when considering the deadly weapon special verdict. In fact, the State went as far as to remind the jury that it must answer "no" to the deadly weapon special verdict if it was relying on the stun gun.

This argument, as a whole, clearly demonstrates that the State elected to rely upon the machete as the deadly weapon in relation to each of the charges, not the stun gun or the other weapons in the room. Because the State clearly elected to rely on the machete, Peters's unanimity argument fails.[7]

---

[7] Because we hold that the State elected by asking the jury to consider only whether Peters was armed with the machete, we do not address Peters's assertion that the evidence was insufficient to establish that the stun gun was a deadly weapon for purposes of the sentencing enhancement.

No. 52585-2-II

We hold that (1) Peters's *Brady* argument fails because Peters does not establish materiality and (2) Peters's unanimity argument fails because the State clearly elected which weapon it was relying on for the deadly weapons sentencing enhancement verdicts during closing argument. Accordingly, we affirm the convictions and the deadly weapon sentencing enhancements.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

GLASGOW, J.