IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ANTONIO AVILA-TAMAYO,<br><br>Appellant. | No. 77566-9-I<br><br>UNPUBLISHED OPINION<br><br>FILED: August 5, 2019 |

SCHINDLER, J. — A jury convicted Antonio Avila-Tamayo of rape of a child in the

first degree, count 1; and child molestation in the first degree, count 2. Avila-Tamayo

contends the court erred in admitting his custodial statements. Avila-Tamayo also

claims the prosecutor withheld evidence in violation of Brady v. Maryland, 373 U.S. 83,

83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and for the first time on appeal, challenges the

admission of evidence. We affirm.

FACTS

In June 2015, 28-year-old Antonio Avila-Tamayo lived in an apartment in Burien

with C. and her two daughters, 8-year-old N. and 7-year-old K. On June 15, N. told a

school counselor that her mother's boyfriend was sexually abusing her. King County

Sheriff Detective Larry Zydek, Detective Chris Knudsen, and patrol officer Robell

Ghrmai went to the school. A few minutes after they arrived, Avila-Tamayo came to

pick up N. and her sister K. from school. The police informed Avila-Tamayo that he was under arrest because of a disclosure made by one of the girls. Avila-Tamayo asked whether it was about "the videos." Officer Ghrmai arrested Avila-Tamayo and drove to the Burien precinct.

The detectives remained at the school to interview N. and K. Detective Knudsen interviewed N. and Detective Zydek conducted a "safety interview" with K. The detectives audio recorded the interviews.

N. told Detective Knudsen that Avila-Tamayo was her mother's boyfriend and that he lived with them. During the interview, N. described multiple incidents of sexual abuse. Specifically, that Avila-Tamayo repeatedly forced her to engage in anal and vaginal intercourse and perform oral sex. N. said the anal penetration "hurt so bad" and during oral sex, Avila-Tamayo pushed his penis "all the way" down her throat and it made her "throw up." N. described specific incidents in the bathtub. N. said Avila-Tamayo made her "copy" the "nasty things" he showed her on his computer tablet, cell phone, and the television. N. told Detective Knudsen that Avila-Tamayo also sexually abused her younger sister K.

After interviewing N. and K., Detective Knudsen and Detective Zydek went to the Burien precinct to interview Avila-Tamayo. Detective Knudsen video recorded and conducted the interview primarily in Spanish.

Avila-Tamayo initially denied having sexual contact with N. or K. or exposing them to pornography. But later, Avila-Tamayo admitted he had "sexual contact" with N. approximately six months before and put N.'s mouth on his penis. Avila-Tamayo

2

admitted he inappropriately touched both girls' vaginas two or three times. Avila-Tamayo said the last time it happened was approximately a month before.

Avila-Tamayo gave the police permission to search his tablet. The detectives drove to the apartment with Avila-Tamayo to seize the tablet. Avila-Tamayo briefly spoke with the children's mother. Avila-Tamayo told her the police "came looking for me" and, "I'm guilty."

The State charged Avila-Tamayo with rape of a child in the first degree of N. and child molestation in the first degree of K.

Avila-Tamayo filed a motion to suppress the statements he made to Detective Knudsen during the recorded interview. Avila-Tamayo conceded Detective Knudsen advised him of his Miranda[1] rights in his native language Spanish and provided him with a Miranda form in Spanish. But Avila-Tamayo argued Detective Knudsen did not accurately convey the meaning of those rights because he mispronounced the Spanish word for "exercise." Following the CrR 3.5 hearing on the admissibility of the statements Avila-Tamayo made to Detective Knudsen, the court denied the motion to suppress. The court entered extensive findings of fact and conclusions of law.

The State called several witnesses to testify at trial, including N., K., the detectives, N.'s friend to whom she initially disclosed the abuse, and the children's mother C. The court admitted the recorded interview of N. and Avila-Tamayo into evidence and the State played the recordings for the jury.

N. was extremely reluctant to testify about the incidents she previously disclosed. However, N. testified that Avila-Tamayo penetrated her vaginally and anally with his

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

finger. She recalled that it happened in her bedroom at night when she woke up to Avila-Tamayo touching her. N. said the same touching happened in the living room. N. said Avila-Tamayo touched her "using his finger on the inside of where you go pee-pee . . . [m]ore than ten times."

K. testified that when she was seven years old, Avila-Tamayo "started doing the things he started with [N.] . . . that was inappropriate." Specifically, K. said Avila-Tamayo put his "private part" inside her "private part" where she goes "pee" and moved back and forth. K. said she felt "burning inside." K. testified this happened approximately 10 times. K. also testified Avila-Tamayo had anal intercourse with her more than 5 times and it felt like "being bitten by a crocodile." K. described another time when she was on the couch and Avila-Tamayo touched her "private part" with his hand. K. said Avila-Tamayo instructed her not to tell her mother and never touched her when her mother was home.

The defense presented expert witness testimony about the suggestibility of children and a child's memory. Another defense witness testified that while babysitting, she caught N. watching a movie with sexual content on a tablet.

Avila-Tamayo testified. Avila-Tamayo denied any sexual contact with N. or K. Avila-Tamayo testified that he lied during the recorded police interview because he thought the police "believed the girls" and had already decided the allegations were true. Avila-Tamayo testified he believed he "had no other option" and thought the police would treat him leniently if he confessed.

The jury convicted Avila-Tamayo as charged.

4

ANALYSIS

Adequacy of Miranda Warnings

Avila-Tamayo argues the court erred in finding Detective Knudsen adequately informed him of his Miranda rights. Avila-Tamayo asserts that because Detective Knudsen did not correctly translate "exercise," he did not knowingly, intelligently, and voluntarily waive his rights.

Before interrogating a suspect in custody, law enforcement must inform the suspect that he has the "right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning." Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Any waiver of these rights must be knowing, voluntary, and intelligent. State v. Radcliffe, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008). The State has the burden of showing a waiver of Miranda rights by a preponderance of the evidence. State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).

In determining whether a defendant voluntarily waived his Miranda rights, the court must consider the totality of the circumstances. State v. Allen, 63 Wn. App. 623, 626, 821 P.2d 533 (1991). An express oral or written waiver is not necessary to establish a voluntary and valid waiver. State v. Rupe, 101 Wn.2d 664, 678, 683 P.2d 571 (1984). Where the defendant is informed of his Miranda rights, understands those rights, and chooses to volunteer information in the absence of duress, promises, or threats; the court can infer waiver. State v. Terrovona, 105 Wn.2d 632, 646-67, 716 P.2d 295 (1986).

Language barriers do not prevent a valid waiver:

> Although a suspect's ability to make a knowing and intelligent waiver of his Miranda rights may be inhibited by language barriers, a valid waiver may be effected when a defendant is advised of his Miranda rights in his native tongue and claims to understand such rights. Further, the translation of Miranda from English to Spanish need not be perfect — it is sufficient that the defendant "understands that he does not need to speak to police and that any statement he makes may be used against him."

State v. Teran, 71 Wn. App. 668, 672-73, 862 P.2d 137 (1993) (quoting United States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir. 1990)), abrogated on other grounds by State v. Neeley, 113 Wn. App. 100, 52 P.3d 539 (2002).

In support of the motion to suppress, Avila-Tamayo submitted an English transcript of the interview conducted by Detective Knudsen in Spanish. The court also admitted the video-recorded interview at the CrR 3.5 hearing.

Officer Ghrmai and Detective Knudsen testified at the CrR 3.5 hearing. Officer Ghrmai testified that he communicated with Avila-Tamayo in English. Officer Ghrmai said he advised Avila-Tamayo of his Miranda rights in English two times using a preprinted card. Both times, Avila-Tamayo indicated that he did not understand. But when Officer Ghrmai specifically asked if he "understood that he had the right to remain silent," Avila-Tamayo confirmed that he did understand. And when Officer Ghrmai asked if he "understood that he had the right to an attorney," Avila-Tamayo said he understood. Officer Ghrmai did not ask Avila-Tamayo any other questions and transported him to the Burien precinct.

Detective Knudsen testified that he uses Spanish in the course of his work, "often daily," and described himself as a "proficient" Spanish speaker but not "fluent." Detective Knudsen testified, "I'm able to have conversations with people, generally

understand what they're saying and make myself understood." Detective Knudsen said

he initially spoke to Avila-Tamayo in English and then quickly transitioned to Spanish

because Avila-Tamayo did not seem to understand some of his questions and

confirmed his preference for Spanish.

Q. And why did you start speaking Spanish?
A. He didn't seem to be understanding some of the questions in English.
Q. How did you know he did not understand the questions in English?
A. I believe there was one question that he told me he didn't understand, and then again a few minutes later when he seemed confused I switched to Spanish.
Q. Okay. And so that we're clear, Mr. Avila[-Tamayo] actually stated to you when he didn't understand something that he didn't understand?
A. I believe he did.

Detective Knudsen said he decided not to use the "Language Line" interpreter because

he could communicate in Spanish.

Detective Knudsen said that before interviewing Avila-Tamayo, he advised Avila-

Tamayo of his due process rights under the Fifth Amendment to the United States

Constitution using a preprinted, office-issued Spanish advisement form. Before reading

the form, Detective Knudsen asked whether Avila-Tamayo could "read okay." Avila-

Tamayo laughed and answered, "[N]o." Nevertheless, Detective Knudsen "turned the

form towards him so he could follow along" as Detective Knudsen read the form in

Spanish.

Detective Knudsen advised Avila-Tamayo of each of the seven enumerated

rights on the form. After each advisement, Avila-Tamayo affirmatively indicated he

understood and expressed no confusion. In the last advisement, Detective Knudsen

used the correct Spanish word "ejercer" to inform Avila-Tamayo that he could exercise

7

his right to remain silent and his right to consult with an attorney at any time. Avila-Tamayo indicated that he understood his rights. In the waiver and acknowledgement portion of the form that states the suspect decided not to exercise his rights at this time, Detective Knudsen used the word "ercer," a nonexistent Spanish word, instead of "ejercer," the Spanish word for "exercise." Avila-Tamayo did not ask any questions, indicated he understood his rights, and signed the form.

The trial court reviewed the translated transcript and video recording of the interview. The court denied the motion to suppress. The court entered written findings of fact and conclusions of law on the CrR 3.5 motion to admit the statements Avila-Tamayo made to Detective Knudsen during the recorded interview. The written findings state that after considering the testimony of Detective Knudsen, Detective Zydek, and Officer Ghrmai and reviewing the "admitted pre-trial exhibits and briefing submitted by the State and the Defense," the court concluded:

> The defendant was advised of his constitutional rights in the Burien station shortly after questioning began. The State has demonstrated by a preponderance of evidence that the defendant was properly advised in Spanish of his [Miranda] warnings and that he knowingly, intelligently and voluntarily waived his rights in providing a recorded statement to Detective Knudsen. Moreover, the defendant was not threatened or promised anything by Detectives Knudsen and Zydek, and he provided a statement with a full understanding of what he was doing.

The unchallenged findings state, in pertinent part:

bb. Detective Knudsen then went through the [Miranda] rights from the King County Sheriff's Office-issued form in Spanish. He read them out and had the form for the defendant to review as he went through them.

cc. Detective Knudsen asked the defendant if he "could read okay." The defendant laughed and said no. However, the defendant did not indicate that he could not read.

8

dd. Detective Knudsen went through each of the [Miranda] Rights on the form with the defendant and the defendant acknowledged understanding all the rights on the form.

ee. Per the provided interview transcript and the video of the interview, there were no apparent errors in the translations and there were no questions asked from the defendant about the rights as they were read to him. Detective Knudsen read the rights in Spanish in the pretrial hearing to demonstrate how he went through them with the defendant.

ff. At line 108 in the transcript of the defendant's interview, the portion pertaining to the waiver section of the advisement of rights form, Detective Knudsen mispronounced the word exercise, and, per the transcript, there appears to be no such word in Spanish for the word he pronounced. At line 106 of the transcript, Detective Knudsen properly pronounced the Spanish word for exercise when he explained to the defendant that he could exercise his rights at any time. In the video and according to Detective Knudsen, the defendant appeared to understand that he could exercise his rights at any time and he acknowledged this.

gg. The defendant signed the form waiving his rights. This form was admitted into evidence as pretrial exhibit 10. The signing of the waiver of rights form was also shown on the video of the interview, admitted as pretrial exhibit 11.

The court concluded, in pertinent part:

Per consideration of the totality of the circumstances after reviewing the transcript and the video/audio recording of the defendant's interview, after hearing argument and after considering all briefing and admitted exhibits, the Court finds that the defendant's contention that he did not understand his rights is not credible. The Court also finds that the defendant understood all provisions of the Miranda warnings and the waiver of rights form as signed. The Court finds the testimony of Detective Knudsen and now-Detective Ghrmai to be credible.

We will not disturb a trial court's conclusion of a voluntary waiver if the trial court finds by a preponderance of the evidence that the statements were voluntary and substantial evidence in the record supports the finding. Athan, 160 Wn.2d at 380. Substantial evidence exists where there is a sufficient quantity of evidence in the record

9

to persuade a fair-minded, rational person of the truth of the finding. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Unchallenged findings are verities on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

Because Avila-Tamayo does not assign error to any of the findings of fact, we treat those findings as verities.

The findings, particularly the findings that there were no translation errors as to the substantive rights afforded under Miranda and that Avila-Tamayo acknowledged he understood each of those rights, support the court's conclusion that Avila-Tamayo validly waived his rights.

Avila-Tamayo relies on United States v. Botello-Rosales, 728 F.3d 865 (9th Cir. 2013), to argue the mispronunciation of the word "exercise" rendered the advisement of rights ineffective. Botello-Rosales is distinguishable. In Botello-Rosales, the detective told the defendant in Spanish, " 'If you don't have the money to pay for a lawyer, you have the right. One, who is free, could be given to you.' " Botello-Rosales, 728 F.3d at 867.[2] The detective used the Spanish word "libre" to mean "free." Botello-Rosales, 728 F.3d at 867. But because "libre" translates to "being available" or "at liberty to do something," it suggested that the defendant's right to appointed counsel was "contingent on the approval of a request or on the lawyer's availability" and failed to accurately convey the "government's absolute obligation" to appoint an attorney for an indigent suspect upon request. Botello-Rosales, 728 F.3d at 867. By contrast, Detective Knudsen did not affirmatively mislead Avila-Tamayo. The error did not negate the core

---

[2] Footnote omitted.

requirements of <u>Miranda</u>.[3] The uncontroverted record shows Detective Knudsen correctly advised Avila-Tamayo that he could exercise his rights at any time. The error in this case affected only the explanation of the acknowledgment and waiver portion of the form. Even if the error created some ambiguity as to whether Avila-Tamayo expressly waived his rights, the unchallenged findings establish the totality of the circumstances supports waiver. The trial court did not err in concluding Avila-Tamayo voluntarily, knowingly, and intelligently waived his rights and his custodial statements were admissible at trial.

Brady Violation

Avila-Tamayo also claims that because the State violated <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the court erred in denying his motion to suppress his recorded statements. Avila-Tamayo relies on the defense pretrial interview with Detective Knudsen. When asked whether anyone had previously challenged his Spanish proficiency, Detective Knudsen stated that in another case, he mispronounced the Spanish word for "decided" while advising a suspect of his <u>Miranda</u> rights.[4]

Under <u>Brady</u>, the State is required to disclose all potentially exculpatory evidence, including impeachment evidence. <u>State v. Mullen</u>, 171 Wn.2d 881, 894, 259 P.3d 158 (2011). To establish a <u>Brady</u> violation, the defendant must demonstrate (1) the evidence is favorable, either as exculpatory or impeachment evidence; (2) the State

---

[3] We also reject Avila-Tamayo's argument that he was not adequately informed of his right to counsel. In Spanish, Detective Knudsen read, "[I]f I do not have the means to hire an attorney, one can be appointed for me at no cost if I so decide." Notwithstanding the fact that it did not include the mechanics of the process of appointment, this language accurately informed Avila-Tamayo of his right to appointed counsel.

[4] Detective Knudsen testified that at the time of the interview, he believed "part of the statement had been excluded simply based on a word that I mispronounced" in Spanish. But Detective Knudsen later learned there was a separate issue regarding the court certified translation of the statement.

withheld the evidence; and (3) the evidence was material to the defense. State v. Davila, 184 Wn.2d 55, 69, 357 P.3d 636 (2015). Evidence is material if there is a reasonable probability that disclosure would have changed the outcome of the proceeding. Mullen, 171 Wn.2d at 897. A reasonable probability exists if the suppression of evidence undermines confidence in the outcome of the trial. Mullen, 171 Wn.2d at 897.

The court addressed Detective Knudsen's testimony and the prior case. The court concluded the State did not violate Brady. The findings and conclusions state, in pertinent part:

> Detective Knudsen described a previous custodial interview statement that he believed was partially suppressed in a prior, unrelated case because he garbled or mispronounced words but later understood that this partial suppression was based on interpreter error rather than on his error.
>
> . . . .
>
> The court does not find that the partial suppression of a statement taken by Detective Knudsen on the unrelated case referenced is impeachment evidence . . . and thus does not find that there was a Brady violation as alleged. Moreover and significantly, the court finds that information regarding the partially suppressed statement in the prior case was disclosed to the defense in a defense interview back on December 2, 2016, some seven months prior to this hearing, and that the defense has had a chance to not only investigate the partial suppression, but . . . also that the defense was able to address it during the course of these pretrial hearings.

The unchallenged findings support the conclusion that the State did not unlawfully withhold material or impeachment evidence from the defense. The trial court also noted there was no withheld evidence because the defense learned of the incident many months before trial.[5]

---

[5] We also note Avila-Tamayo does not explain how the pronunciation error in the other case is exculpatory.

Admission of Evidence

For the first time on appeal, Avila-Tamayo asserts the trial court abused its discretion by admitting testimony about multiple sexual acts involving N. and K. Avila-Tamayo claims the evidence was inadmissible under ER 403 because the prejudice outweighed the probative value.

In general, a party may not raise an evidentiary challenge on appeal unless that challenge was preserved below by a proper objection. RAP 2.5(a). One exception is a manifest error affecting a constitutional right. RAP 2.5(a)(3). A claim of evidentiary error is not of constitutional magnitude. State v. Everybodytalksabout, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002), rev'd on other grounds, 161 Wn.2d 702, 166 P.3d 693 (2007). Therefore, a party is limited on appeal to arguments related to the specific objections raised to the trial court. State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

Contrary to Avila-Tamayo's argument on appeal, he did not object to the victims' testimony on the basis of ER 403 or on any other ground. Before N. and K. testified, the State indicated N. and K. would testify about multiple incidents that took place within the two-year charging period. The defense did not object to the anticipated testimony. The defense attorney stated, "[I]t's up to the State to decide" how to support the charges and meet its burden of proof. The defense took the position that the victims could "testify to whatever they want" and a Petrich[6] instruction would resolve any issue raised by evidence of multiple incidents to support a single charge. The defense strenuously

---

[6] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). The court provided Petrich instructions to the jury on each charge that required the jurors to "unanimously agree" as to one single act the State proved beyond a reasonable doubt.

objected to giving a limiting instruction. The defense argued a limiting instruction would improperly "bolster" the State's case. The court ruled it was not necessary to address admissibility of prior misconduct under ER 404(b) because it appeared there was no evidence of conduct outside the charging period. The defense did not object to the trial testimony of N. or K. describing multiple acts of abuse. The court did not give a limiting instruction.

Because Avila-Tamayo did not object to the testimony of N. and K. under ER 403, he waived his claim of error and we decline to address his argument raised for the first time on appeal.

We affirm the convictions of rape of a child in the first degree and child molestation in the first degree.

_Schindler, J_

WE CONCUR:

_Mann, A.C.J._

_Dwyer, J._