IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84239-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| TERRANCE JOE QUINLAN, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — After a dispute over a rented room, Terrance Quinlan fired a handful of gunshots at Santokh Tara-Singh and his girlfriend, Amanda Gomez, as they fled the scene. Quinlan was later charged with and convicted of first degree assault, two counts of first degree unlawful possession of a firearm, and felony violation of a court order. On appeal, Quinlan asserts that his counsel was ineffective for failing to object to testimony that was irrelevant and overly prejudicial. He also contends the victim penalty assessment should be stricken because he is indigent. And in a statement of additional grounds, he raises several issues related to his due process rights, his right to privacy, and the effectiveness of his trial counsel. Finding no error regarding his convictions, we affirm but remand for the court to strike the victim penalty assessment.

FACTS

In 2020, Gary Sayers and his wife were living in a house in Kent and renting out one of the rooms to Santokh Tara-Singh. The rental terms were established by verbal agreement and Tara-Singh had no formal lease. In

exchange for rent, Tara-Singh, a mechanic, worked on cars that Sayers bought at auctions and later sold. Tara-Singh's girlfriend, Amanda Gomez, frequently stayed at the house with him.

On October 1, 2020, Tara-Singh and Gomez arrived at the house to find Tara-Singh's room door had been kicked down and his room had been ransacked. Many of Tara-Singh's belongings were missing. When Tara-Singh confronted Sayers about the break-in, Sayers admitted that he broke into the room and that he wanted to rent the room to Terrance Quinlan instead. Quinlan was also present at this time, along with his girlfriend, Leah Roberts, and his cousin. Sayers started demanding that Tara-Singh vacate the room immediately but offered to let him move his things to the living room. Quinlan joined in with Sayers and demanded that Tara-Singh leave the premises. After arguing with Sayers and Quinlan for a few more minutes, Tara-Singh and Gomez decided to leave.

While Gomez gathered her belongings, Tara-Singh headed to his car parked in the driveway. A short while later, Tara-Singh tried to go back into the house to help Gomez but discovered that the door had been locked. He could hear Gomez shouting "[l]et me out" on the other side; Gomez also yelled through the door that Quinlan was blocking the exit. Gomez and Quinlan started pushing each other at the door, and Tara-Singh was eventually able to push the door open enough to allow Gomez to escape. Once Gomez was outside, the two rushed to Tara-Singh's car.

2

Sayers, Roberts, and Quinlan's cousin followed Tara-Singh outside. Roberts ran toward the car and hit the front windshield with a brick while Quinlan's cousin and Sayers attempted to pry the car doors open. After doing a 180-degree fishtail, Tara-Singh managed to maneuver around the other cars blocking the driveway. As Tara-Singh exited the driveway, he heard a gunshot and then his car's rear window shattered. A second gunshot hit the corner panel near Tara-Singh's head. Tara-Singh looked over his shoulder as he drove away and saw Quinlan standing on the porch with a handgun pointed in his direction. Quinlan fired at least three other shots that missed the car. Two of those shots struck a neighbor's house, one hitting the garage and the other travelling through the house and lodging in the front door.

Tara-Singh was shocked and afraid but uninjured. Gomez, however, was bleeding from a bullet fragment that had grazed her neck. Tara-Singh started to drive towards the hospital but stopped when he realized that Gomez's injury was minor. Tara-Singh and Gomez instead drove to a nearby 7-Eleven convenience store and asked a bystander to call 911.

Several Kent police officers, along with a few on-duty special weapons and tactics (SWAT) officers, responded to Sayers's house in response to the shooting. Suspecting that the shooter was still inside, officers established a perimeter outside the house and ordered all occupants outside. Sayers and his wife complied and exited the house. Officers determined from the missing cars in the driveway that Quinlan had already left the scene before police arrived.

3

Using global positioning system (GPS) pings from Quinlan's cellphone, officers were later able to determine his location. Officers then conducted surveillance of Quinlan for about a week. During this time, officers witnessed Quinlan with Roberts, in violation of a no-contact order protecting Roberts.

On October 23, a joint task force comprised of officers from the Bureau of Alcohol, Tobacco, and Firearms (ATF) and the Department of Corrections (DOC)[1] arrested Quinlan outside a convenience store. Police vehicles surrounded Quinlan's car to prevent him from fleeing and, because his windows were too darkly tinted to allow officers to view inside the car, officers broke the windows. Roberts was found nearby and officers noted that she had dyed her dog's fur a different color than they'd previously observed.

After the arrest, officers spotted a gun in the center console of the car. Detective Daniel Yagi of the Kent Police Department obtained a search warrant for the car and it was transported to a secure impound lot. Once at the lot, officers searched the vehicle and recovered the gun in the center console.

Quinlan was transported to the Kent police station and agreed to speak with the officers. He denied involvement in the shooting, claimed not to know Sayers, and told officers he did not know there was a gun in the car. He also denied owning a cellphone, despite police finding one on his person.

Quinlan was charged with first degree assault, two counts of first degree unlawful firearm possession, and felony violation of a court order. A jury convicted him as charged. Quinlan appeals.

---

[1] These agencies frequently work together to perform arrests.

ANALYSIS

Ineffective Assistance of Counsel

Quinlan claims his trial counsel was ineffective for not objecting to irrelevant and overly prejudicial testimony about the police investigation and his subsequent arrest. Because the testimony was both relevant and not overly prejudicial, we disagree.

We review ineffective assistance of counsel claims de novo. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. Estes, 188 Wn.2d at 457. To prevail on an ineffective assistance of counsel claim, a defendant must establish (1) that counsel's performance was deficient, and (2) that deficiency resulted in prejudice. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Counsel's performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To show prejudice, the defendant must show that there was a " 'reasonable probability' " that but for the deficient performance, the result of the proceedings would have been different. State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). If either element of the test is not met, our inquiry ends. Kyllo, 166 Wn.2d at 862.

There is a strong presumption that representation was effective. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." Kyllo, 166 Wn.2d at 863. "Decisions on whether and when to object to trial testimony are classic examples of trial tactics." State v. Crow, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). If an appellant focuses "their claim of ineffective assistance of counsel on their attorney's failure to object, then '[they] must show that the objection would likely have succeeded.' " State v. Vazquez, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting Crow, 8 Wn. App. 2d at 508). However, if counsel fails to object to inadmissible evidence, then they have performed deficiently. Vazquez, 198 Wn.2d at 248.

Only relevant evidence is admissible. ER 402. "Relevant evidence" is any evidence that tends to make a fact of consequence more or less probable than it would be without that evidence. ER 401. But relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. Testimony about police investigations is relevant because the average juror has little to no knowledge about police investigations and may question the appropriateness of the officers' actions if not properly explained.[2]

---

[2] Relying on State v. Aaron, 57 Wn. App. 277, 787 P.2d 949 (1990), Quinlan asserts that "[e]vidence of the circumstances of a person's arrest is typically irrelevant and inadmissible." But the issue in Aaron was far narrower: the court focused its analysis on whether a hearsay exception applied and did not announce such a broad sweeping rule as Quinlan suggests. 57 Wn. App. at 280 (concluding that officer's state of mind in reacting to dispatcher's statement was not relevant for another purpose other than proving the truth of the matter asserted).

State v. Perez-Arellano, 60 Wn. App. 781, 783-84, 807 P.2d 898 (1991) (evidence that defendant was arrested for delivery of controlled substance in a "high narcotic area" relevant to explain why police were surveilling the area). The threshold to admit relevant evidence is very low and even minimally relevant evidence is admissible. State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

Here, Quinlan contends that testimony from law enforcement officers about the circumstances of his arrest and the related investigation were irrelevant and unduly prejudicial because the testimony (1) suggested the offenses were particularly egregious, (2) implied that police had information not in the record suggesting Quinlan was an extreme danger to society, and (3) gave the jury the impression that the police had already deemed Quinlan guilty. He also challenges testimony by a neighbor as irrelevant and unduly prejudicial. We address each witness's testimony in turn.

Officer Garth Corner. Quinlan objects to the following testimony from Officer Corner:

- That "on-duty SWAT" responded to the incident at Sayers's house.
- That there were safety concerns necessitating more officers on the scene and containment of the house.

This testimony from Officer Corner was relevant to explain the actions of law enforcement. Officer Corner explained that establishing a perimeter around the house was necessary because officers believed the suspected shooter was still inside the house. He also noted that additional safety precautions were

warranted because the officers received a report that flammable containers were inside the house and that at least one roommate was still inside the house even after officers ordered everyone to vacate.

We disagree that this testimony was unduly prejudicial. The reference to the SWAT response was in passing and, as the officer noted, an "on-duty" SWAT response is very different from, and much smaller than, a full SWAT deployment. And the reference to "safety concerns" was also not unduly prejudicial—it is apparent that the response to a report of a shooting presents a safety concern.

<u>Detective Doug Whitley</u>. Quinlan challenges the following testimony from Detective Whitley:

- That law enforcement obtained cellphone location data to locate Quinlan.
- That officers surveilled Quinlan for a week with a high-powered camera.
- That officers placed GPS trackers on cars associated with Quinlan.
- That officers decided against using a search warrant and chose to arrest Quinlan away from his residence "for the safety" and to avoid using a SWAT team.
- That the Kent Police Department obtained the assistance of a joint "task force" that included ATF and DOC officers to arrest Quinlan.
- That at least three vehicles were used to block Quinlan's car.
- That officers "jumped out of their vehicle" and "broke the windows [of Quinlan's car] and then demanded compliance."

Detective Whitley's testimony about cellphone location data, the high-powered camera, the task force, and the pinning technique was relevant to explain the propriety of the investigation and how law enforcement was able to find Quinlan. It was also relevant to show that Quinlan was located at Sayers's house near the

8

time of the shooting and that Quinlan was with Roberts in violation of the no-contact order.

None of this testimony was unduly prejudicial. Detective Whitley testified that cellphone data is commonly used in investigations to locate suspects and noted that a court order is necessary to obtain such information. And although Quinlan asserts that he was surveilled for a week with a high-powered camera, Detective Whitley's testimony only supports that Quinlan was photographed on a single occasion while outside doing yard work. Moreover, the detective noted that the high-powered camera was only used because law enforcement wasn't "a hundred percent sure" that the individual was Quinlan. As to the car tracking, Detective Whitley testified that only two cars were being tracked and that they were both cars associated with Quinlan and with Roberts. The detective's testimony about the joint ATF and DOC task force, the procedure for pinning Quinlan's car, and the number of cars used to pin Quinlan's car was not unduly prejudicial because these were brief statements and not part of a central theme in the State's case. And even if defense counsel believed this evidence was inadmissible, counsel's performance is still not deficient for failing to object to it; it is a legitimate trial tactic to decline to object to inadmissible evidence to avoid emphasizing it. State v. McLean, 178 Wn. App. 236, 247, 313 P.3d 1181 (2013).

We note that the detective's testimony about the search warrant and use of SWAT was objected to by defense counsel and the objection was sustained. The permitted testimony did not mention SWAT and explained that the officers'

"safety concerns" with executing the warrant had to do with displacing other residents at the home.

Officer Cody Blowers. Quinlan contests the following testimony from Officer Blowers:

- That when he arrived at Sayers's house, at least three officers were already there waiting for additional officers to arrive because it was "a dangerous shooting."
- That with "violent crimes and stuff like that SWAT will come out" and that a SWAT team did respond in this case.

Quinlan's argument that Officer Blowers' testimony was irrelevant and unduly prejudicial is unconvincing. Again, testimony about the police investigation was relevant to explaining how Quinlan was apprehended and the propriety of the investigation. That three or more officers responded to a reported shooting is unsurprising and to be expected. Shootings are, by their very nature, dangerous and violent crimes. The officer explained that SWAT frequently works with the Kent Police Department to help serve warrants in situations involving guns. So, Officer Blowers's testimony tended to show that SWAT involvement was not an indication that Quinlan himself was unusually dangerous.

Specialist John Conaty. Quinlan asserts that the following testimony from ATF Specialist Conaty was irrelevant and unduly prejudicial:

- That his "ATF task force," comprised of officers from different law enforcement agencies, "was the primary [agency] that was going to arrest Mr. Quinlan."
- That the task force conducted surveillance on Quinlan before the arrest.
- That the task force wanted "to prevent him from fleeing" because "somebody who's driving erratically or trying to get away from an arrest poses a safety risk."

- That the procedure of blocking a car in and breaking its windows was not unusual "in this kind of case."

As discussed, testimony about ATF's actions and involvement with the arrest and surveillance was relevant to explain to the jury how the gun was recovered and to help the jury evaluate the propriety of the investigation. Because the jury heard testimony that ATF routinely assisted the Kent Police Department with investigations, this testimony was not unduly prejudicial.

We note, too, that Quinlan mischaracterizes and misquotes part of Specialist Conaty's testimony. Specialist Conaty did not imply that Quinlan had been driving erratically—he explained that the procedure of boxing in a car is to prevent a suspect from fleeing and to insure "the safe arrest of the person" and the safety of the officers. Because the safety of all parties involved is of paramount concern, Specialist Conaty explained that "somebody who's driving erratically or trying to get away from an arrest poses a safety risk"—he did not specify that Quinlan was driving erratically or trying to escape. Likewise, Specialist Conaty clarified that the procedure of boxing in a car is not unique to Quinlan's case—law enforcement uses this tactic whenever a suspect is in a car to insure safety.

The same is true for breaking the car's windows. Specialist Conaty explained that "seeing people's hands is the most important thing" because "if they hold a weapon or anything like that, it can hurt you, so that's primarily the reason why [the officers here] ended up having to break windows is because they're so darkly tinted we can't see inside there." And when asked whether breaking windows is standard operating procedure or unusual, Specialist Conaty

11

replied, "It's not unusual." None of the specialist's testimony suggested to the jury that Quinlan was uniquely dangerous; rather, the testimony indicated that law enforcement employed standard tactics used in most cases involving suspects in cars.

Marie Vergara. Quinlan takes issue with the following testimony from Marie Vergara, Sayers's neighbor:

- That a bullet entered her home and went through the infant room of the daycare she runs out of her house.
- That Sayers's house was irksome and the neighborhood felt unsafe.
- That at least four or five police cars responded to Sayers's house that evening.

This testimony was relevant to the charges involved and not unduly prejudicial. Vergara identified the room on a diagram to show the path of the bullet, which was relevant to prove that the gunshots originated from Sayers's house. Vergara did not comment on the infant room but simply referred to the room by its purpose, which was not improper and did not warrant an objection.

Vergara's comment that the higher volume of traffic around Sayers's house made the neighborhood seem unsafe is also not unduly prejudicial to Quinlan. It could even support Quinlan's theory of the case that someone else was responsible for the shooting. Vergara's testimony that four or five police cars responded to the scene is similarly not unduly prejudicial. When asked how many police cars were at the scene, Vergara first responded, "I don't remember" before adding that there were "at least four to five." That four or five police cars

12

responded to a shooting incident—where the suspect was still at large—does not indicate an outsized police response.

We also emphasize that Quinlan's counsel did attempt to exclude much of the testimony Quinlan challenges on appeal. During motions in limine, defense counsel moved to prevent members of the task force arrest team from testifying that Quinlan was on DOC supervision, that he had a DOC warrant out, or that the DOC officers were even involved in supervising offenders at all. On these facts, Quinlan fails to demonstrate that his counsel was deficient.

## Victim Penalty Assessment

Quinlan maintains that the victim penalty assessment should be stricken because of his indigent status. The State agrees.

The legislature recently amended RCW 7.68.035 to prohibit the imposition of a victim penalty assessment if the court finds that the defendant is indigent at the time of sentencing. As neither party disputes that Quinlan was indigent at the time of sentencing, we remand for the court to strike the assessment from the judgment and sentence.

## Statement of Additional Grounds

In a statement of additional grounds, Quinlan asserts that officers violated his right to privacy by seizing evidence from his car without a warrant and by using excessive force. He also contends that his due process rights were violated when police failed to turn over exculpatory evidence. Finally, he argues that his counsel was ineffective for not objecting to either of these violations. We

13

disagree that Quinlan's right to privacy or his due process rights were violated and therefore disagree that his counsel was ineffective.

1. Right to Privacy

Article I, section 7 of the Washington State Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of the law." The "authority of the law" needed is typically a warrant, with a few narrow exceptions.[3] State v. Cornwell, 190 Wn.2d 296, 301, 412 P.3d 1265 (2018).

Here, the officers had a warrant to search Quinlan's car. Detective Yagi testified that officers obtained a warrant to search Quinlan's car a few days after he was arrested. During the search, officers located a 9mm Smith & Wesson handgun inside the center console.

Quinlan also claims that the officers used excessive force in violation of the Fourth Amendment by trapping his car with three police vehicles. Because Quinlan does not explain why this tactic constituted excessive force, we decline to reach this issue. See Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

---

[3] Quinlan notes that individuals on probation have a reduced expectation of privacy and that a community corrections officer may search these individuals based on a reasonable suspicion of a probation violation rather than a warrant. He then argues that the officers in this case did not have reasonable suspicion of a probation violation and that the search was unlawful. Because the officers had a warrant to search the car, we do not need to address whether the search met this lower standard.

2. Due Process

To comply with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a duty to preserve such evidence for the defense. State v. Armstrong, 188 Wn.2d 333, 344, 394 P.3d 373 (2017). But this rule does not require the police to search for exculpatory evidence. Armstrong, 188 Wn.2d at 345. To establish a violation of this rule, a defendant must establish (1) that the evidence is favorable, either because it is exculpatory or impeaching, (2) that the evidence was suppressed by the State, either willfully or inadvertently, and (3) that the evidence is material. State v. Davila, 184 Wn.2d 55, 69, 357 P.3d 636 (2015).

Quinlan asserts that the State breached its duty to disclose exculpatory evidence by failing to obtain and produce video footage of the shooting that was captured by a neighbor. The record paints a different picture. At trial, the State learned from one of its witnesses that a neighbor possibly possessed surveillance video of the events at issue. The prosecutor told the court that an officer had previously attempted to retrieve the video but was unsuccessful and that the State would try to locate the video immediately. The State successfully retrieved the video that same day and disclosed it to defense counsel. The video captured only the audio of four to six gunshots and video of Tara-Singh's car driving down the street. Because the video did not provide any new information outside the testimony given at trial, it was not exculpatory. Despite the delay in obtaining the evidence, we conclude that Quinlan suffered no due process violation.

3. <u>Ineffective Assistance of Counsel</u>

Finally, Quinlan argues that his counsel was ineffective for failing to object to the allegedly warrantless search and the due process violation. Because the search was not warrantless and Quinlan suffered no due process violation, there was nothing for Quinlan's counsel to object to and counsel was not ineffective.

We affirm and remand for the court to strike the victim penalty assessment.

_Smith, C.J._

WE CONCUR:

_Feldman, J._          _Dwyer, J._