# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of: | No. 59486-2-II |
| JOHN FRANCIS JUDE SUPPAH, | UNPUBLISHED OPINION |
| Petitioner. | |

CRUSER, C.J.—In this timely personal restraint petition, John Francis Jude Suppah challenges his jury trial convictions for second degree murder, drive by shooting, second degree unlawful possession of a firearm, unlawful possession of a stolen vehicle, and two counts of witness tampering. Relying on e-mails obtained after his conviction through a public records request, Suppah argues that (1) the State violated his right to a fair trial by knowingly presenting false testimony from one of the State's witnesses regarding whether the witness was benefitting from his testimony; (2) the State violated his due process rights by failing to disclose the potentially exculpatory evidence regarding this witness' benefit from testifying in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and (3) he received ineffective assistance of counsel because his trial counsel failed to discover this potentially exculpatory evidence. Because these arguments fail, we deny Suppah's personal restraint petition.

FACTS

I. Background

A. The Murder and Disposal of Firearm

On the night of December 18 through 19, 2015, Suppah, his girlfriend Nadine Lezard, and their acquaintance Thomas Watts left a hotel in a stolen silver Honda Accord. While Suppah was driving, he used Lezard's cell phone to set up a meeting with Preston Stafford in Tacoma.

When they arrived in Tacoma, Suppah pulled the car over to wait for Stafford. Stafford approached the car, opened the back door, and leaned inside the car. Suppah shot Stafford and then drove away. Stafford later died of his injuries.

After the shooting but before his arrest, Suppah contacted David Legge to arrange to trade his gun and some jewelry for drugs, cash, and another gun. Legge arranged for Suppah to meet with another person to make the trade and was present when the trade took place.

B. Investigation, Arrest, Charges, and Legge's Disclosures

Using information obtained from Stafford's and Lezard's cell phones, law enforcement located Suppah and Lezard at a local casino and arrested them. In a post-arrest statement, Lezard identified Suppah as the shooter, disclosed that the car used in the shooting was at the casino, and stated that Suppah possessed the car keys. Keys and an electronic key fob were found on Suppah, and the key fob was later used to locate the silver Honda in the casino parking lot. A spent shell casing that was not inconsistent with having been fired by a gun similar to Suppah's gun was found in the car.

On December 22, 2015, the State charged Suppah with first degree murder, drive-by shooting, and second degree unlawful possession of a firearm. On May 9, 2017, the State amended

the information to add charges of second degree felony murder, unlawful possession of a stolen vehicle, and two counts of witness tampering.

C. LEGGE'S ARRESTS AND DECISION TO CONTACT LAW ENFORCEMENT ABOUT SUPPAH

Meanwhile, in October 2015, the State charged Legge in Thurston County Superior Court with several forgery and identity theft offenses. He was released from custody after serving 23 days in jail.

Then, in May 2016, the State charged Legge in Pierce County Superior Court with two counts of forgery and two counts of first degree identity theft. Legge was taken into custody in Pierce County on June 19, 2016. On November 16, 2016, Legge pleaded guilty to amended charges of two counts of forgery and two counts of second degree identity theft.

The standard range for the Pierce County offenses were 14 to 18 months and 22 to 29 months of confinement. Pursuant to the plea agreement to these charges, the State's sentencing recommendation was "open," but the State agreed to recommend a sentence that would run concurrent with the Thurston County matter. Response App. at 112. Legge's sentencing was set over to permit the parties to come to a resolution with the Thurston County case.

Meanwhile, in December 2015, Legge, learned that Suppah had been charged with murder. On October 11, fearing that he would be implicated as an accessory to the murder and realizing that he might have some relevant information, Legge contacted law enforcement about his involvement with Suppah's gun trade. Legge met with detectives in Suppah's case on November 3. Legge met with detectives again the following April.

On August 3, 2017, as part of an effort to facilitate a global plea agreement with both counties, the State re-filed Legge's Thurston County charges in Pierce County Superior Court.

II. Suppah's Trial

A. Pretrial Discussion Regarding Legge's Testimony

During pretrial proceedings in Suppah's case, the deputy prosecutor notified the trial court and Suppah that he was "hop[ing] to work out a formal deal with Mr. Legge" that would result in his pleading guilty as charged to the charges that originated in Thurston County. 1 Verbatim Rep. of Proc. (VRP) (Aug. 15, 2017) at 132. If a formal agreement was reached, the State would either have Legge enter his guilty pleas before his testimony in Suppah's trial or it would memorialize the agreement to permit the defense to cross-examine Legge about any expected benefit. No formal agreement was reached before Legge testified.

B. Testimony

Suppah's trial started on August 15, 2017.

The State presented testimony from numerous witnesses, including Lezard, Watts, and Legge. These witnesses testified as described above.

1. Lezard and Watts

In addition to the facts above, Lezard and Watts also testified that they were testifying pursuant to cooperation agreements with the State and that they would benefit from testifying truthfully. Lezard testified that she had pleaded guilty to second degree murder and that if she testified in Suppah's trial she would be able to withdraw that plea and plead guilty to first degree rendering criminal assistance. If this occurred, she would be released based on the time she has already served.

Watts testified that he had pleaded guilty to first degree rendering criminal assistance but had not yet been sentenced and that he was offered a plea deal in exchange for his cooperation in

Suppah's case. Watts had been out of custody since he agreed to cooperate, but he would go back into custody for 6 to 12 months if his deal was revoked.

Lezard and Watts also testified that Suppah shot Stafford and that he did so because Stafford owed him money for drugs.

2. LEGGE

Legge testified about Suppah contacting him about facilitating the gun trade.

Legge also testified that before Suppah's arrest, he saw Suppah and Lezard almost every day and that Suppah was possessive of Lezard. At one point when Lezard was not present, Legge observed Suppah going through the messages on Lezard's phone. Suppah discovered that Lezard was either seeing or in contact with someone else; flew into a rage; and, "[w]ith a pistol in his hand," announce that he was " 'going to kill the son of a bitch when I find him.' " 9 VRP (Aug. 31, 2017) at 1459. Legge also stated that he shared this information with the detective investigating the murder.

During this testimony, both parties questioned Legge about his extensive criminal history and whether he was deriving any benefit from testifying in Suppah's case.

Legge testified that he was currently in jail and awaiting sentencing on several forgery and identity theft-related felony convictions. Legge stated that he believed that the standard sentencing range for the offenses for which he was awaiting sentencing was 22 to 29 months. Legge further testified that there was also another set of charges for first and second degree identity theft and forgery pending against him. And he admitted that he had a substantial criminal history including forgery, theft, and stolen property-related offenses.

The deputy prosecutor questioned Legge extensively about whether he was testifying pursuant to a cooperation agreement:

Q [STATE]. Are you at this time cooperating with the State?

A [LEGGE]. I am.

Q. Do you have a deal in place as it relates to your crimes for which you are pending sentencing?

A. I don't have a deal in place as far as what is upcoming, no, I don't.

Q. Nothing formalized?

A. No, sir.

Q. Are you hoping that you will have some kind of a plea bargain offered to you as a result of cooperation?

A. One could hope, but it is not really the reason that I was here.

Q. How is it that you came to the attention of law enforcement as someone who had information relating to this case?

A. I talked it over with my attorney prior to [contacting law enforcement] and saying that I had information about this because I felt that something had been passed through me that might make me guilty of a crime and guilty enough of a crime that I could look at possible life imprisonment.

*Id.* at 1420-21.

The prosecutor then questioned Legge about why he notified law enforcement of his involvement with Suppah, and the following discussion occurred:

A [LEGGE]. Well, I knew I was facing the charges that I had. And when you know you have time to think about what might be coming down the pipeline, you sit there and go, okay, well, this might be extremely relevant, you know.

Q [STATE]. Did you think that based on something that had happened prior to you coming into custody that you had exposure for additional charges?

A. Yes.

Q. Did that relate to an interaction with Mr. Suppah?

A. Yes, sir.

*Id.* at 1429.

The prosecutor also questioned Legge about his current felony convictions and the pending charges,

Q [STATE]. Mr. Legge, as far as the pending charges that you have, both the ones that are pending sentence -- and you already have -- you have signed a plea form?

A [LEGGE]. Yes, I have.

Q. You already know what the State has agreed to recommend in that case at the time that you signed the plea form?

A. For some of my charges, yes.

Q. You have nothing more formal with respect to that charge or your pending ones for being here today?

A. No, I do not.

Q. What you are telling the jury is really what happened in December of 2015?

A. Absolutely.

*Id.* at 1441-42.

During cross examination, defense counsel attempted to clarify Legge's potential deal with the State:

Q [DEFENSE COUNSEL]. So you pled guilty of several crimes, and the State has not yet given you the final recommendation or offer; is that correct?

A [LEGGE]. No. I have an offer.

Q. Do you have a benefit that the State has promised you in this case?

A. No, I do not.

Q. But the State is in a position where, later on, they are going to recommend some kind of sentence for you, right?

A. They are going to have to.

Q. And that is an exchange for this testimony that you are doing now, right?

A. I have absolutely no idea. I have not heard anything about that yet.

Q. So what exactly is your agreement with the State with regards to this testimony?

A. *One thing is, I'm not going to be charged with a crime for facilitating an avenue -- having a possible -- it is possible that the murder weapon was passed through me, and I'm not going to be charged with a crime for it.*

Q. Anything else?

A. Not at this time.

Q. Are you hoping, in the future, to get some benefit, for instance, a reduction in the sentence you would otherwise get?

A. *I will hope for anything that gets me out of jail right now.* I have been here 15 months.

Q. In your discussions with the prosecutor, was it discussed that based on your cooperation at the end of all of this, you would then get a recommendation?

A. Possibly.

Q. Possibly? Does that mean you don't remember?

A. No. That means I have been given nothing to recommend.

Q. As of this time right now, the State hasn't given you a specific recommendation?

A. No, they have not.

Q. In the future, they are going to give a recommendation, right?

[STATE]: Judge, I would object to what I'm going to do. He can only ask about what Mr. Legge is expecting.

THE COURT: Overruled. I will allow the question.

[DEFENSE COUNSEL]: Thank you.

Q. (By [defense counsel]) So in the future --

A. As of right now, I currently have enough time in that I am going to meet whatever requirements are for the sentencing guidelines that they already have. Them offering me anything benefits me nothing at all.

Q. The question is, is it an open recommendation? Meaning that right now, there is no specific recommendation; but at the end of your cooperation period, there will then be a recommendation; is that accurate?

A. One could hope.

Q. What is your agreement with the State?

A. I have none.

Q. Including no benefit at a later time?

A. I don't know what the State is going to do at a later time.

Q. That was not my question. My question was, do you expect the State to do something to your benefit in the future in exchange for this testimony?

A. I don't know what to expect. I will hope. How is that?

Q. Your agreement, though, is that the State will give a recommendation at the end of this cooperation agreement; is that correct?

A. Okay.

Q. Is it correct?

A. I guess so. I don't know.

Q. You don't know?

A. I don't know.

Q. So you don't know what your agreement is with the State; is that fair?

9

*A. Sure.*

*Id.* at 1442-45 (emphasis added).

A short time later, defense counsel again questioned Legge about the reason he provided information about Suppah to the police:

Q [DEFENSE COUNSEL]. Now, I would like to talk a little bit about your initial kite. You sent a kite saying that you had some information, and Detective Rock came and spoke with you; is that correct?

A [LEGGE]. Correct.

Q. Do you recall what the reason that you told Detective Rock was in terms of why you were going to give the information?

A. Because I felt totally that a pistol had been passed through me. I couldn't be 100 percent sure that it was a murder weapon, even though John was arrested the next day, but *I was going to make 100 percent sure that I'm not going to be found guilty of some kind of accessory towards a capital murder crime and end up spending 15 years to life in prison for something that I didn't participate in.*

Q. That's what you told Detective Rock right off the bat, right?

A. Right off the bat.

*Q. Okay, first thing. The first thing that you said was, you don't agree with what he did, and because I'm facing charges myself, you know, looking to maybe possibly barter some of that. Does that sound familiar?*

*A. That in -- what? April sometime? The first time I met with Detective Rock was in November. It was not a transcribed meeting.*

*Q. Did you tell Detective Rock what I just read?*

*A. Yes sir.*

*Id.* at 1446-47 (emphasis added).

Defense counsel then questioned Legge again regarding his discussions about why he wanted to talk about his contact with Suppah:

10

Q [DEFENSE COUSNEL]. Well, when you went to talk to Detective Rock, you told him that the purpose that you wanted to talk to him was to work on kind of a deal because you knew that you had charges down the pipe?

A [LEGGE]. *The purpose of it was because somebody traded a pistol, presumed to be a murder weapon, through me. I had no desire to be part of this.*

Q. Did you tell Detective Rock regarding why you [contacted law enforcement]: And also because I'm facing charges myself and, you know, looking into maybe barter some of that?

A. Sure. Bartering is this: I don't want to be charged with a capital crime.

Q. Well, you haven't been charged with any capital crime, right?

A. Not at this time I hadn't.

Q. But you were facing other charges, right?

A. Yes, I was.

Q. You said: Also because I'm facing charges myself and, you know, looking to maybe barter some of that?

A. Okay.

Q. Is what you said?

A. Sure, at that time.

Q. So at that time, you were thinking about a cooperation deal because you said barter some of that, so you had an idea that you would be sitting here?

*A. Well, then it took so long to get here that I'm actually looking at time served.*

*Id.* at 1461-62 (emphasis added).

After questioning Legge more about the gun trade and difference between what Legge testified to and what Legge told Detective Rock, the following discussion ensued:

Q [DEFENSE COUNSEL]. You can remember that now, but you couldn't remember that at the time that you talked to Detective Rock?

11

A [LEGGE]. It wasn't relevant.

Q. Didn't you go there to talk about the gun being traded?

A. *I went there to talk about to see whether or not I could get immunity for what is going on, whether the information that I had was pertinent enough that they would even be interested in it*. It wasn't, here, Mr. Legge, sit down, let's transcribe everything down right now to the point of having a stenographer there, and everything is going to be said exactly the way it is because you are going to be under scrutiny down the line. That's not the way it was.

It was, sit down here. Would you like a cup of [sic] coffee? You're handcuffed in a room over at the police station. They say, okay, what do you got? You sit there and you start talking. Uh-huh. All right. I have some of that. Can you tell me what happened over here? Well, I think that I remember this happened like this. And it's pretty unnatural to sit there and try to dig things out of your memory like that. It really is.

The event happened, but I don't recall exactly what was said to Detective Rock on two different occasions.

*Id.* at 1465-66 (emphasis added).

3. DEFENSE WITNESS

Suppah's sole witness was his friend Andrew Johnson, who testified that he was with Suppah and other people at a hotel room at the time of the shooting. Suppah did not testify.

C. VERDICT AND APPEAL

The jury found Suppah guilty of first degree manslaughter, second degree murder, drive by shooting, second degree unlawful possession of a firearm, possessing a stolen vehicle, and two counts of witness tampering. The trial court later vacated the first degree manslaughter conviction. The judgment and sentence was entered on October 13, 2017.

Suppah appealed, and this court affirmed his convictions in December 2022.

### III. LEGGE'S PLEA AND SENTENCING

After Suppah's trial, the State and Legge began negotiating Legge's cases. These negotiations lasted several months.

On February 2, 2018, several months after Suppah's sentencing, Legge pleaded guilty to his pending charges and was sentenced on those charges and on the other charges to which he had previously pleaded guilty. The pending charges had originated in Thurston County, and they were transferred to Pierce County to facilitate a global resolution of his Pierce and Thurston County cases.

On the Pierce County charges, the trial court imposed the joint sentencing recommendation that resulted in a total sentence of 25 months with credit for time served.

Regarding the charges transferred from Thurston County, the parties' joint sentencing recommendation was for concurrent standard range sentences on counts 1 and 5 and exceptional sentences downward of 25 months on the remaining counts for a total sentence of 25 months.[1] The parties also requested that the sentences on the transferred charges run concurrent to each other and to the sentences imposed in the case that originated in Pierce County.

The deputy prosecutor advised the trial court that the request for the exceptional sentence below the standard range for the transferred charges was based on Legge's participation in Suppah's murder trial. Defense counsel also advised the trial court that while these cases were pending Legge "stood up and did something right." VRP (Feb. 2, 2018) at 15. Defense counsel further commented that with his credit for time served, Legge would have already served his

---

[1] The standard ranges for these offenses were 63 to 84 months and 43 to 57 months.

sentence. The trial court adopted the parties' sentencing recommendation and imposed a total sentence of 25 months.

IV. SUPPAH'S PUBLIC RECORD REQUEST AND PRP

Meanwhile, while his appeal was pending, Suppah submitted a public records request seeking files from the Pierce County Prosecutor's Office pertaining to deputy prosecutor John Neeb, who prosecuted his case and Legge's cases. The prosecutor's office produced five installments of records numbering well over 2200 pages. Suppah has submitted eight pages (pages 2192 through 2200) of the documents produced in the public record request in support of this PRP.

The records Suppah has submitted are e-mails from August 2016, before Legge talked to law enforcement about his involvement with Suppah in October 2016, through February 26, 2018, after Suppah's trial and sentencing. The e-mails are between Neeb, the Thurston County deputy prosecutor, and the defense attorneys representing Legge in the Pierce and Thurston County matters, and they address the possibility of transferring the charges against Legge that originated in Thurston to Pierce County to facilitate a global resolution of the charges in both counties.

The e-mails begin with August 24, 2016 e-mails between Legge's Pierce County defense counsel, John Meske, and his Thurston County defense counsel, James Shackleton, regarding Legge's charges in Pierce and Thurston County and the possibility of obtaining a global resolution wherein the sentences in both counties would run concurrently. On August 30, Shackleton advised Meske that the Thurston County deputy prosecutor would be inclined to recommend a prison-based drug offender sentencing alternative (DOSA) as a plea recommendation. Meske responded that in light of this, they could first pursue the plea to the Pierce County charges in Pierce County and then run it concurrently with the Thurston County sentence. Meske proposed that they both

confirm with their respective deputy prosecutors that they could achieve a global resolution of both cases.

On September 30, Meske e-mailed Shackleton and asked him to confirm that if they entered the plea in Pierce County with a concurrent sentencing recommendation with the Thurston County DOSA request, that the Thurston County deputy prosecutor would be able to transfer Legge immediately from the Department of Corrections (DOC) to Olympia to resolve the Thurston County case. Shackleton also stated that Legge wanted "this confirmation in writing." PRP App. G at 2198. Later that day, Shackleton forwarded this e-mail to Olivia Zhou, the Thurston County deputy prosecutor. Shackleton advised Zhou that Meske "needs e-mail confirmation from you that -- if David Legge pleads guilty to his charges in Thurston County -- you will recommend a concurrent prison based DOSA." *Id.* Shackleton also advised Zhou that Meske was requesting a transport order that would transfer Legge directly to Thurston County Jail rather than send him to the DOC first.

Notably, the August and September 2016 e-mails were exchanged before Legge disclosed his contacts with Suppah in October 2016.

The next e-mail is dated May 9, 2017, after Legge contacted law enforcement about his involvement with Suppah, but before Suppah's trial began. In the first e-mail, from Meske (the Pierce County defense attorney) to Shackleton and Zhou, Meske stated:

> As for an update on the David Legge matter, our sentencing was set over again because the Sup[pah] First Degree Murder case was set over. Mr. Legge is cooperating with the State in this matter. He is a material witness with regards to the element of pre-meditation. It is our hope that the State in the Thurston County matter will consider an amendment to the charges there as a result of Mr. Legge's cooperation in Pierce County. Pierce County has agreed to run his sentence of 22-29 months concurrently with the sentence in Thurston County. We are hoping that the charges there can be amended to reflect his cooperation.

> *Please note that the offer to Mr. Legge was made and accepted before the Sup[pah] case came to light*. It was after the plea that Mr. Legge mentioned that the defendant in the murder had told him of his intention to kill the victim. So Mr. *Legge did not receive any deals [in the cases originating in Pierce County] for his cooperation*. The hope is that Thurston County will provide some benefit to him for his critical cooperation.

*Id.* at 2197 (emphasis added). Notably, although it was sent after Legge's disclosures, this e-mail shows that the global resolution of the Thurston and Pierce County cases and the 22-to-29-month sentence recommendation in the case originating in Pierce County were in place before Legge mentioned his involvement with Suppah.

Two subsequent e-mails sent on May 9 discuss the fact Legge had been in custody on the Pierce and Thurston County matters for approximately a year at this point. And in one of the e-mails, Meske comments, "He is really standing up in the murder case, which he had nothing to do with, and has met with the detectives on several occasions." *Id.*

The next set of e-mails were sent on May 31. In the first e-mail, Meske e-mailed Shackleton and Zhou to see if they had "discussed a possible sentence reduction [in relation to the charges originating in Thurston County] due to [Legge] cooperating" in Suppah's case. *Id.* at 2196. Meske commented that they hoped that Thurston County would "consider something that will allow for credit for time served, essentially agreeing to a sentence recommendation that is concurrent with what we have here in Tacoma." *Id.*

At this point, Shackleton recommended to Meske and Zhou that they consider having both cases resolved in Pierce County. Shackleton commented that "the Pierce County deputy prosecutor would be in the best position to evaluate the benefit of Mr. Legge's testimony when fashioning a global resolution." *Id.* Zhou responded that this was "[f]ine with [her]." *Id.*

Later that day, Meske e-mailed Neeb, the Pierce County deputy prosecutor in Suppah's case, and asked him how to set over the sentencing in Legge's Pierce County case to permit them to figure out what to do and whether both prosecutors agreed to transfer the Thurston County case to Pierce County. Neeb responded that he was willing to take over the Thurston County case and advised the other parties about the transfer process.

On September 22, 2017, the first e-mail dated after the verdict in Suppah's case, Neeb e-mailed Zhou and Shackleton and advised them that Legge was going to plead guilty as charged to the charges that originated in Thurston County on November 1. Neeb also advised them that Legge would be released on his personal recognizance until then.

Finally, on February 6, 2018, Neeb e-mailed Zhou and Shackleton to advise them of the final disposition of their former case. Neeb described Legge's guilty plea and stated, "Because of his cooperation in an unrelated murder case, he was given an exceptional sentence downward to 25 months." *Id.* at 2192.

Based on these e-mails, Suppah filed this PRP.

ANALYSIS

I. PRP PRINCIPLES

To prevail in a PRP, a petitioner must establish (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018).

To establish actual and substantial prejudice, the petitioner must show that the outcome of the trial likely would have been different if the alleged error had not occurred. *In re Pers. Restraint*

17

*of Davis*, 200 Wn.2d 75, 86, 514 P.3d 653 (2022). In making this determination, we look to the totality of the circumstances based on the whole record, including the weight of the evidence of guilt. *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985).

## II. FALSE TESTIMONY

Suppah argues that the State deprived him of his right to a fair trial by knowingly presenting false testimony from Legge relating to his credibility in several instances. This argument fails because Suppah either fails to establish that the challenged testimony was false or fails to establish the required prejudice.

### A. LEGAL PRINCIPLES

Prosecutors may not knowingly present false evidence or testimony to obtain a conviction or allow such testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). This premise applies broadly, including when "the false testimony goes only to the credibility of the witness." *Id.* at 269. A " 'conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 936, 952 P.2d 116 (1998) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)).

### B. NO FALSE TESTIMONY OR ACTUAL AND SUBSTANTIAL PREJUDICE

Suppah argues that Legge's testimony that he had no " 'deal in place as far as what is upcoming,' " was false. PRP at 1 (quoting 9 VRP (Aug. 31, 2017) at 1421). At best, the e-mails show that at the time Legge testified at Suppah's trial in August 2017, there had been discussion

regarding Legge receiving some benefit for cooperating in Suppah's case, not that any cooperation agreement or deal had actually been reached.

Although the case originating in Thurston County had been transferred to Pierce County to facilitate a global resolution of the Pierce and Thurston County cases, the e-mails clearly show that the transfer of the case originating in Thurston County and the portion of the global resolution related to the sentencing recommendation on the case originating in Pierce County were agreed to *before* Legge became involved in Suppah's case rather than as a result of his participating in Suppah's case. The e-mails also show that there had been some discussion of Legge receiving some benefit in the case originating in Thurston County. But none of the e-mails show that any type of agreement had in fact been reached by the time of Suppah's trial. Thus, the e-mails do not support Suppah's argument that Legge testified falsely when he said there was no deal in place regarding his then-pending charges or sentencings.

Suppah further asserts that Legge's testimony that he had served enough time in jail prior to testifying that he had essentially already served any potential sentence and that he was not gaining anything by testifying was false. With respect to the charges originating in Pierce County, Legge's plea agreement to the Pierce County charges is irrelevant because it was reached before Legge disclosed any involvement in Suppah's case and was not related to his participation in Suppah's case.

With respect to the charges originating in Thurston County, Suppah is correct that Legge could have benefitted from a sentencing recommendation below the standard range if any agreement had existed. But, considering the record as a whole, Suppah cannot establish that there is a reasonable likelihood that this testimony could have affected the jury's judgment.

Despite any error in this testimony, the jury was well aware that Legge benefitted from his testimony in Suppah's trial. For instance, Legge's testimony made it clear that he was participating in the case to avoid being charged with rendering criminal assistance. And this benefit would remain even if Legge was in custody long enough that any potential sentences had effectively been served before he was actually sentenced following Suppah's trial. Because the jury was aware that Legge was potentially deriving a substantial benefit by participating in Suppah's trial, there is no reasonable likelihood that any misstatement about whether he would also serve a shorter sentence if he testified could have affected the jury's judgment.

Suppah also asserts that Legge's testimony that he did not want " 'to be a part of this' " and that he was just trying to " '[b]arter[ ]' " in order to avoid being charged with a capital crime, was false. PRP at 1 (quoting 9 VRP (Aug. 31, 2017) at 1461). Legge did testify that he did not "want to be charged with a capital crime." 9 VRP (Aug. 31, 2017) at 1462. But the record as a whole shows that he merely misspoke and that he meant to say he did not want to be charged with being an "accessory towards a capital murder crime." *Id.* at 1446.

Furthermore, even assuming that some of Legge's statements challenged by Suppah were false, Suppah does not establish a reasonable likelihood that this testimony could have affected the judgment of the jury. The jury is the sole evaluator of a witness' credibility, and it is free to find a witness credible in some respects and not credible in others. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003) ("A jury is free to believe or disbelieve a witness, since credibility determinations are solely for the trier of fact."). As previously noted, the jury heard that Legge's participation in Suppah's case was an attempt to avoid a rendering criminal assistance charge. Additionally, although Legge denied there being an existing agreement allowing him to benefit

20

from his testimony with respect to his pending sentencing and charges, he clearly stated that he was "hoping" to benefit from his testimony. 9 VRP (Aug. 31, 2017) at 1443. Thus, the jury still heard evidence that Legge had a motive to testify against Suppah, and Suppah cannot show that there was a reasonable likelihood that any allege misstatement or misrepresentation would have affected the jury's judgment.

### III. BRADY ISSUE

Suppah further argues that Neeb deliberately suppressed the e-mails attached in appendix G, or the information in these emails, in order to bolster Legge's credibility in violation of *Brady*. This argument fails.

### A. LEGAL PRINCIPLES

In *Brady*, the United States Supreme Court outlined the government's disclosure requirements in a criminal prosecution: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A *Brady* violation is a violation of a defendant's constitutional due process rights. *State v. Mullen*, 171 Wn.2d 881, 893, 259 P.3d 158 (2011). " 'The animating purpose of *Brady* is to preserve the fairness of criminal trials.' " *Id.* at 895 (quoting *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006)).

To establish a discovery violation that would compel relief under *Brady*, the appellant must demonstrate that (1) the evidence at issue was favorable to the accused, (2) the State suppressed the evidence, either willfully or inadvertently, and (3) the suppression resulted in prejudice. *Id.* Favorable evidence that requires disclosure includes both exculpatory and impeachment evidence. *State v. Davila*, 184 Wn.2d 55, 70, 357 P.3d 636 (2015).

In the context of the third *Brady* prong, "materiality" and "prejudice" have the same meaning. Evidence is not material unless it is prejudicial and not prejudicial unless it is material. *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 679-80, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).[2]

B. NO MATERIALITY

At best, the e-mails Suppah discovered revealed that at the time Legge testified there was a possibility that he would benefit from his participation in Suppah's case. This is exactly what Legge testified to, so there is no reasonable probability that the result of the proceedings would have been different if the State had disclosed these e-mails or the information in these e-mails suggesting there was some type of negotiation between the State and Legge to the defense prior to Suppah's trial.

And to the extent the e-mails or the information they contained would have suggested that Legge was incorrect when he asserted that he had served sufficient time in jail that he would not

---

[2] Importantly, the question of materiality, or "prejudice," is a question that a court determines in the face of a claim that a prosecutor either is withholding, or previously withheld, information that should be or should have been disclosed. A prosecutor has a broad discovery obligation, the specifics of which are set forth in CrR 4.7. The prosecutor, in deciding whether to disclose information in discovery, is not permitted to withhold information on the ground that *the prosecutor believes* it is not material. Stated another way, materiality is a retrospective determination made by the court when deciding whether reversal is required, not an initial determination to be made by the prosecutor. *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 181 L. Ed. 2d 571 (2012) (if the State withholds favorable evidence, the question before the court is whether that evidence was material to the determination of guilt).

benefit from any reduction in sentence, as discussed above, there is no reasonable probability that the jury would have been influenced by this incorrect testimony because Legge's other testimony clearly established that he was participating in Suppah's trial in order to avoid additional charges. Accordingly, this argument fails.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Suppah argues that his defense counsel provided ineffective assistance of counsel because he failed to discover the impeachment evidence in appendix G. Suppah again contends that the evidence in appendix G shows that Legge presented perjured testimony because he testified that he was not receiving any benefit from testifying in Suppah's trial, and he asserts that had defense counsel discovered this evidence he could have further impeached Legge's credibility. This argument fails.

To establish ineffective assistance of trial counsel, Suppah must show that (1) trial "counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances," and (2) this deficient representation was prejudicial, "i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice" for PRP purposes. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Suppah fails to demonstrate that there is a reasonable probability that the result of the trial would have differed had defense counsel discovered the e-mails in appendix G. As previously

stated, even if these e-mails demonstrated that Legge's statement that he would not have derived a benefit with regard to his pending charges and sentencing was false, his testimony still disclosed that he was participating in Suppah's case to avoid a rendering criminal assistance charge. This clearly demonstrated that he expected to derive a benefit from his participation in Suppah's case and raised issues about his credibility. Because of this, there was no reasonable probability that the result of Suppah's trial would have been different had defense counsel been aware of these e-mails, and Legge's ineffective assistance of counsel claim fails.

CONCLUSION

Because Suppah's claims fail, we deny this PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____<br>CRUSER, C.J.

We concur:

_____<br>MAXA, J.

_____<br>GLASGOW, J